JOHN B. HEWETT CO., INC. *v.* UNITED STATES (No. 5038)[1]

United States Court of Customs and Patent Appeals, Nov. 17, 1960

*Jordan & Klingaman* (*J. L. Klingaman*, of counsel) for appellant.

*George Cochran Doub*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Henry J. O'Neill* and *Murray Sklaroff*, trial attorneys, of counsel) for the United States.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[2]

MARTIN, Judge, delivered the opinion of the court:

██ This is an appeal from the judgment of the United States Customs Court, Second Division, C.D. 2140, overruling the importer's

---

[1] C.A.D. 757.

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to provisions of Section 294(d), Title 28, United States Code.

protest and sustaining the classification of B.T.U. meters for tariff purposes as "Instruments suitable for measuring flowage of liquids" under paragraph 368(a) of the Tariff Act of 1930. Appellant contends that the imported merchandise should be classified as machines, not specially provided for, under paragraph 372 of the Act or as manufactures of metal, not specially provided for, under paragraph 397 of the Act.

Paragraph 368(a) of the Tariff Act of 1930, as modified by the supplementary trade agreement with Switzerland, 90 Treas. Dec. 174, T.D. 53832, so far as pertinent, reads:

* * * any mechanism, device, or instrument intended or suitable for measuring distance, speed, or fares, or the flowage of water, gas, or electricity, or similar uses * * *

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Other * * *

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

 Over $10_____ $2.25 each and 35% ad val.

Paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, reads:

| Description of Products | A [3] | B [4] |
|---|---|---|
| Machines, finished or unfinished, not specially provided for: | | |
| Adding machines * * * | | |

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

| Other _____ | 13% ad val. | 12% ad val. |
|---|---|---|

Paragraph 397, modified as is paragraph 372, supra, reads:

| Description of Products | A [3] | B [4] |
|---|---|---|
| Articles or wares not specially provided for, whether partly or wholly manufactured: | | |

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal * * *

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

 Not wholly or in chief value of tin or tin plate:
 Carriages, drays, trucks * * *

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

| Other * * *_____ | 21% ad val. | 20% ad val. |
|---|---|---|

It is evident that the meters in controversy are designed and intended to measure the amount of heat which is lost from or gained by a water circulating system. This amount of heat is measured in British Thermal Units (B.T.U.). A B.T.U. is the amount of heat required to raise one pound of water one degree Fahrenheit. It ap-

[3] Rate effective June 30, 1956.
[4] Rate effective June 30, 1957.

pears undisputed that the following testimonial statement is properly descriptive of the meters:

* * * The b.t.u. meter consists of a flow meter, an integrating mechanism mounted on the liquid or flow meter, and two temperature-sensitive bulbs filled with mercury which are inserted into the supply and return pipe or into the cold and hot water lines. The integrator includes two six-digit counters, one of which indicates the total heat supplied in b.t.u.'s, the second counter records total gallons passed through the meter. A pointer above the counter indicates the temperature differences in degrees Fahrenheit of the supply and return liquid.

In a hot water circulating system intended to heat a room, for example, water enters through a hot water supply line, passes through radiators, and leaves through a cold water return line. The cold water is then reheated and recirculated. The B.T.U. meter is installed in such a system. The flow of water through the meter and the mercury in the two temperature-sensitive bulbs in the supply and return lines together actuate the integrating mechanism which in turn actuates the B.T.U. counter. Thus the counter records in a cumulative fashion the amount of heat leaving the circulating system. During the meter operation, an observer may also read the temperature difference in the supply and return lines at the instant of observation and the number of gallons of water which has flowed through the meter since the last observation. It appears that gallon flow and temperature difference observations are intended only as checks on meter operation. The primary function of the meter is to measure heat loss or gain in the water circulating system.

It was stipulated by adversary counsel that the B.T.U. meters in issue are composed wholly or in chief value of base metal, not plated with gold, silver, or platinum, and not colored with gold lacquer.

The Customs Court held that the B.T.U. meters in controversy come within the purview of the provisions of paragraph 368(a), as modified, supra. That court said:

Even were it found that the instant B.T.U. meters, as a whole, are not mechanisms, devices, or instruments intended or suitable for measuring the flowage of water, it is our view that the meters presently before the court are measuring devices having a similar use to the items denominated in paragraph 368, supra. Whereas the record discloses that the primary purpose of the involved meters is to provide a reading in B.T.U.'s of energy used in a heating or refrigerating system and that the user is not interested in the volume of water as such

which passes through the meter, it, nevertheless, is a fact that in order for the device to supply the desired reading in B.T.U.'s the volume of water passing through the meter is an essential factor in arriving at such reading.

Appellant urges that since the collector did not classify the article in question as one for "similar uses," there is no presumption that it is a similar article and that it was the duty of the Government to convince the court of similarity.

The Government's position was summarized by counsel as follows:

For the purpose of the record I would like to make clear that it's the Government's position although the classification seemed to put it on the basis of device for measuring the flowage of water, it's the Government's position that it is within the provisions of 368, which reads device, instrument, or mechanism suitable for measuring the flowage of electricity, gas, or water, or similar uses. We say and contend that this device, if it doesn't measure the flowage of water within the true meaning of paragraph 368, that it is similar in use to those specified meters.

There is no doubt that the performance of the meter in measuring the flowage of water is only incidental to the primary objective of the device—measuring the heat loss or gain in the system in which it is used. Consequently, paragraph 368(a) is not applicable to the importations on the basis that they are meters which measure the flowage of water. Therefore, the question before us is whether this paragraph applies to the imported devices by reason of the inclusion of the words "or similar uses" in it. If Congress intended that only those meters which measure distance, speed or fares, or flowage of water, gas or electricity be classified under this part of the paragraph, the words "or similar uses" would be meaningless as all types of mechanisms used to measure these items are specifically covered. It is our belief that Congress intended to include meters which make other measurements.

We are of the opinion that the imported devices come within the purview of this paragraph. These meters measure in B.T.U.'s the quantity of heat energy lost or gained as the water flows through a system. Heat is defined in Webster's New International Dictionary (2d Ed., 1949):

1. As generally understood, that which causes a body to rise in temperature, fuse, evaporate, or undergo any of certain other related phenomena as a result of interaction with another body of higher temperature; the energy involved in such phenomena; in terms of the kinetic theory, the energy associated with the minute parts of a body because of their random motions and mutual forces.

The measurement of heat by this mechanism is similar to the measurement of electricity which also is a type of energy.[5] Furthermore, we agree with the opinion of the lower court wherein it was said:[6]

> Moreover, we believe that an analogy exists among an electric meter which measures the watt hours of energy used, a gas meter which registers the consumption of energy in cubic measurement, and the meters in issue which record in British thermal units the heat energy required to operate a heating or refrigerating system. Each is a device for measuring the consumption of energy. It is our opinion, therefore, that the instant B.T.U. meters are in fact and in law devices for a "similar" use to those specifically named in paragraph 368(a) of the Tariff Act of 1930, as modified, *supra.*

Appellant appears to rely on *United States* v. *Cambridge Instrument Co.*, 21 CCPA 508, T.D. 46970, to substantiate its position that the B.T.U. meters are not properly classified in paragraph 368(a). This case involved two importations of accelerometers, one under the Tariff Act of 1922 and the other under the Tariff Act of 1930. Only the latter importation is pertinent here. The accelerometers were described as follows:

> * * * The accelerometer contains a weight set in a spring. This weight is attached to a stylus which moves up and down when the weight is moved. The stylus presses against a celluloid ribbon. This ribbon can be moved forward by a spring motor and when it is moved forward the stylus will record on the celluloid ribbon the movements of the weight. The spring motor or the celluloid ribbon has nothing whatever to do with the operation of the machine, but is simply an apparatus for recording the movements of the weight. The movement of the weight is what indicates the acceleration. It acts on the principle of a seismograph. This depends upon the physical principle that any mass will tend to stay in a position of rest unless acted upon by a force sufficient to move it. The action of this principle may be readily observed in the instrument

---

[5] In Webster's New International Dictionary (2d Ed., 1949), electricity is defined as:
2. * * * Electricity is characterized especially by the fact that it gives rise to a field of force possessing potential energy and that, when moving in a stream (an electric current), it gives rise to a magnetic field of force with which kinetic energy is associated. * * *
In Hackh's Chemical Dictionary (Third Ed.), the definition of energy is:
Capacity or power to do work and overcome resistance; e.g., heat, light, electricity, chemical action or mechanical energy * * *.

[6] The expert witness testified as follows:
Q. Are you familiar with the functioning of electric meters? A. Yes, sir.
Q. What does an electric meter measure? A. Watts, watt hours.
Q. And how is it expressed on the meter, the number of watts consumed by a user of electricity?
&ast; &ast; &ast; &ast; &ast; &ast; &ast;
A. It is indicated on the meter by dials which the meter reader reads and substracts [sic] from the previous reading, thereby giving him the total number of units consumed at that location.
Q. In the form of energy consumed? A. Yes, sir.
Q. Coming to the water meter, coming to the gas meter, what does that record or express or indicate? A. Generally it expresses the number of thousands of cubic meters or cubic feet, depending upon what the factor is, that have passed at a given point.
Q. Again, insofar as the consumer goes, in the form of energy? A. That is correct.

at bar. Normally the weight is clamped so that it will not thrash about in the box. If the weight is unclamped and the box is quickly raised or lowered, the weight will be observed to lag behind the movement of the box and the stylus will move up or down. If the box is placed in an automobile, for instance, and the automobile is accelerated, the weight will lag behind the movement of the car and if the spring motor is wound up and started so that the celluloid ribbon moves, the stylus will record the movement of the weight. If the car remains at the same speed, the weight, of course, will not change its position and if the ribbon is in operation, only a straight line will be recorded by the stylus. If the machine is placed in the automobile vertically and the ribbon is set in motion, it will record the vertical accelerations of the car, that is, its vibration. The more smoothly the car runs, the more nearly will the record approach to a straight line. The movement of the ribbon actuated by the spring motor is simply an accessory recording device. It has nothing whatever to do with the operation of the machine in detecting acceleration or vibration. * * *

This court held that the accelerometers did not respond to the requirements of paragraph 368 of the Tariff Act of 1930 which then read, so far as here pertinent:

Par. 368. (a) Clocks, clock movements * * * and any mechanism, device, or instrument intended or suitable for measuring time, distance, speed, or fares, or the flowage of water, gas, or electricity, or similar uses, * * *.

This court said in pertinent part:

We think the testimony clearly shows that the device measures neither the distance traveled by, nor the speed of, any body to which it is attached. From the record made by the machine it is impossible to tell the distance covered by the body to which it is attached, or its rate of speed. It does not even measure the extent of vibrations of such body, or its acceleration in terms of space, except in a relative way. From a reading of the ribbon no one could determine the extent of vibration or acceleration in terms of miles, feet, or inches. We hold that the devices are not suitable for measuring distance or speed, or for similar uses.

The importations at bar and those involved in the *Cambridge* case are clearly distinguishable. The former are instruments which measure a definite quantity, heat loss or gain, in specific units, while the accelerometers only detect the existence or occurrence of vibration or acceleration in a relative way and do not measure these in specific units.

Other cases cited by the appellant are equally distinguishable on the facts and therefore are not controlling here. For the foregoing reasons, we are of the opinion that the B.T.U. meters are properly classified under paragraph 368(a) of the Tariff Act of 1930. Therefore the decision of the Customs Court is *affirmed*.